Case number 19-2070 and 19-2107. Little Traverse Bay Bands v. Gretchen Whitmer et al. Argument not to exceed 15 minutes per side. Mr. Giampetroni, you may proceed for the appellant. Thank you and may it please the court. David Giampetroni on behalf of the Little Traverse Bay Bands of Odawa Indians. I'd like to reserve three minutes for rebuttal. Your honors, the question before the court is whether the 1855 treaty created an Indian reservation. It did. As McGirt instructs, we first look to the text. In the text, drafted by the architect of the federal reservation policy, ratified by the senate and proclaimed by the president, expressly identifies those lands as reservations and reserved and lands reserved herein for the bands. And when Congress enacted statutory text pertaining to those same lands in the 1870s, referred to them as the reservation and as lands reserved for Indian purposes under the treaty of July 31st, 1855. In both the treaty and those statutes, the text was correct. As McGirt recently reaffirmed, to create a reservation, it is enough that from what has been done, a certain defined tract appropriated to certain purposes. In this case, Indian purposes. And the treaty did that. Counsel, let me ask you, what document or documents are we to be governed by in determining whether we have a reservation? Is it within the four corners of the 1855 treaty or I noticed you were referencing some of the documentation that had occurred in subsequent years. Should we be able to determine whether a reservation was established within the bounds of the 1855 treaty itself? Your Honor, what the Supreme Court has instructed in cases such as Mille Lacs and what this court instructed in the decision in Naftali is that reservation analysis begins with the text. So the text of the treaty, and that can be read in light of the history of the negotiations and the historical context and the party's practical construction adopted by the parties thereafter. But the treaty analysis, reservation analysis begins with the text. And here, the text established a reservation. It set forth a defined tract, appropriated it for the bands and set it apart specifically for them to get permanently settled thereon. Right now, you're referencing the 1855 treaty, is that right? Yes, Your Honor. What language in the treaty is there where it says that it was establishing a reservation? Well, first of all, it refers to the lands as reservations twice. After setting apart the lands on precisely the terms that McGirt calls for, identifying a defined tract and appropriate it for Indian purposes. It does that in article one when it withdraws the land from the public land and dedicates them to the settlement of these bands of Indians. Thereafter, Your Honor, refers to those tracts of land as the aforesaid reservations and as lands reserved herein for the bands. Counselor, I'm having some confusion as to the difference between a 1151 and I'm struggling here as to, I mean, what is the difference and why does this treaty establish a reservation as opposed to just simply an allotment? Your Honor, an allotment under 1151C is an off-reservation of parcel of land. And that's why in 1151C, it's only Indian countries so long as the Indian obtains the Indian title to it. 1151A includes allotments and reservation land and allotments within the reservation so long as it's a reservation. The Supreme Court has found allotments within reservations time and time again to be perfectly consistent with reservation status. So there can be an allotment within a reservation or outside a reservation? Yes, Your Honor. In the Supreme Court, well, in McGirt, in Nebraska v. Parker, in Solemn, all those cases involved the status of allotments within a reservation and all of them had reservation status. Now, as I understand reservation, it would imply that there's a Is that your understanding? Yes, Your Honor. A reservation involves both tribal and federal jurisdiction. I'm struggling here with looking for any evidence post-1855 treaty and the decades after that treaty was signed where there's actually some evidence that the tribe was now claims is a reservation or was a reservation designated by 1855. I see references to the word reservation in a lot of different documents, but I don't see any evidence that the tribe actually was doing any governing of this territory. Do you have any evidence to that effect? Well, a number of the Indian correspondences that we cited in our briefing, Your Honor, clearly indicate that these bands were still operating with tribal governments. Many of those letters to, say, the Secretary of the Interior or the Indian agent were written on behalf of the tribe where the first signatory would be the chief and many references to this chief's band in this particular area. So they very much retained their traditional tribal governance structure and, of course, when after these bands were stripped unlawfully of their federal relationship in 1872 and they were reaffirmed in 1994, Congress expressly found that they had sustained their tribal governments throughout those periods. What effect do we give to that 1994 statute here? I mean, aren't we supposed to be making the determinations of facts as to whether or not there's a reservation? I know the 1994 statute seems to have some language calling it a reservation, but what effect do we give? Do we give to these findings of Congress in 1994? Well, I think they're helpful and illuminative, Your Honor, because the congressional committees there did historical analysis to determine, you know, the history when they concluded that these were intended to be permanent reservations, but we're not citing the 1994 statute as controlling this positive law here. Much more probative, Your Honor, is the 1870 statutes where Congress opened the reservation to non-Indian settlers and specifically referred to the lands as reservations under the 1855 treaty, and in McGirt, Justice Gorsuch pointed to an 1873 statute where Congress simply referred to the Creek Reservation, and Justice Gorsuch said that leaves no doubt what Congress understood. But as fundamentally, Your Honor, what we have here is a parallel between the 1870 statutes and the use of the term reservation in the 1855 treaty, and that language in the 1855 treaty reflects what the treaty did. It's appropriated to Indian purposes, and that's what this treaty did. It included not only specific language setting it apart for the bands, it included textual provisions for individual land ownership, for restraints on alienation, agricultural assistance, and other textual hallmark textual indicia of the civilization program that was at the heart of the reservation program in the 1850s. What about the requirement of federal superintendents of the land? You seem to be arguing that that's not required for a reservation. Is that the tribe's position? It is not, Your Honor. Federal superintendents is a trait shared by all three categories of Indian country under 1151, A, B, and C. But for reservations and allotments, federal superintendents are attached as a matter of law, because in those cases, the federal government has taken explicit action to indicate its intent to create Indian country. By contrast, under 1151B, dependent Indian communities, Justice Gorsuch called that a catch-all category of land, whereby Congress has not, or the federal government has not taken explicit action to reserve or allot, yet still may intend the land to be Indian country. And in that case, what is required is an assertion, an active manifest assertion of federal jurisdiction over those lands to signal that we, the federal government, intend this to be Indian country, and we hereby assert jurisdiction over it. Justice Gorsuch called the active federal and superintendents analysis the 1151B test. Neither the Supreme Court nor any federal court of appeals has ever applied that test to a reservation determination under the definition set forth in the GERT, or to an Indian country definition, Indian country assessment of reservation status under 1151A. How is the federal jurisdiction to be asserted in order for there to be federal superintendents? Is there to be some sort of federal oversight more than with a system of an allotment such that you have federal personnel or federal resources devoted to the land in question? How are we to determine if this land was subject to federal superintendents or not? As a textual matter, Your Honor, the treaty provided for ongoing federal agent monitoring of the Indians' competence to manage their land. As fundamentally, the historical record is recited volumes of information where the federal agents were asserting active federal control and monitoring and the tutelage of the civilization process, assistance in agriculture. May I finish, Your Honor? Certainly. Removing intruders from Indian lands. Now, defendants have suggested that Your Honors are limited to looking to the face of the treaty for active federal superintendents. But in fact, the seminal federal superintendents case under 1151B, were that applicable here, is United States v. Sandoval. And if Your Honors look at United States v. Sandoval, what you will see them looking for, active federal superintendents, the court looks to the Indian agency reports. It reproduces eight or nine of them where the Indian agents are actively tending to the Indians' agricultural pursuits, their spiritual education, their education, in other words, their conduct along the road to quote-unquote civilization. Well, that doesn't sound necessarily much different from federal involvement if you had a dependent Indian community that was not a reservation or if you had a system of Indian allotments. Those things would involve some sort of federal monitoring or oversight. It would seem that there would be more involvement than that if you had a reservation. Well, Your Honor, again, here, the historical record is clear with Indian agents such as Richard Smith who signed the treaty. Richard Smith signed the treaty and... Well, just signing the treaty, that's a one-off event. I mean, we're trying to see what happens such that this land would be run as a reservation, so to speak. Yes, Your Honor, and the Indian agents were visiting these lands like they do reservations. They were distributing annuities there. They were assisting with agriculture. They were inducing the Indians. They were assisting them with their agricultural pursuits. They were removing intruders from the Indian land at the Indian's request. All things that you do within the Indian reservation, all the while espousing statements like this, Agent Fitch, who was at the treaty negotiations. Fulfilling their treaty stipulations on their reservations requires diligence in guarding their rights with the authority of the law. Richard Smith trespasses upon their reservations requires measures for Indian immediate protection. Once again, their reservations were designed and set apart by the government as the permanent home of the Indians. These are practical constructions of the treaty, and the Indian agents, Your Honor, were acting on that. Well, let me ask you this. The tribal members were given individual allotments of land, and that seems more compatible with an allotment system than a reservation. Well, what do you have to say about that? Your Honor, the Supreme Court has said time and time again has reiterated that allotments, including with the potential for land to pass into fee, are completely consistent with reservation status. It has held that time and again, and the reason, Your Honor, is that the reservation concept in the 1850s was about civilizing the Indians to turn them into American farmers, and central to that was the notion of individual property ownership. That was the central organizing principle around which the whole concept of the reservation at that time turned. All right. Anything further? Well, Your Honor, one point I'd like to make is that a main argument of defendants here is that the possibility, the fact that the 1855 treaty, the possibility for patents to issue in fee, and the possibility of land eventually ending up in non-Indian hands is contradictory to reservation status, and what McGirt says is that once a block of land is set aside for an Indian reservation, no matter what happens to the title of plots within the area, the entire block retains its status until Congress explicitly indicates otherwise. Section 1151A of the Indian country statute, reservation prong, says that all lands within reservation, federally established reservation boundaries, are Indian country, notwithstanding the issuance of any patent. Your Honor, that assumes individual land within reservations, and the district court, when it reproduced the Indian country statute, sections A, B, and 3, it eliminated that language, notwithstanding the issuance of any patent, without indicating that it was doing so. Moreover, in 200 pages of briefing, the defendants have not spent one word of argument reconciling their theory of the case with the Indian country definition. The plain and unambiguous statutory text of 1151A said that reservation land is reservations, notwithstanding the issuance of any patent, but McGirt does address that language in 1151, Your Honor, and what McGirt says is that section 1151A expressly contemplates private land ownership within reservation boundaries. Nor, under the statute's terms, does it matter whether these individual parcels have passed hands to non-Indians. This court held the same thing in Cardinal v. United States in 1992, and just a few months ago, a few weeks after McGirt, the Seventh Circuit in the Oneida v. Village of Hobart case said the exact same thing. The Justices of the District of Columbia혹j notence that statutesключines of the 12th Circuitofthe oneida v. Each molta a rush. If the protehes that it had be placed   so they could not be reconstituted for his property, except for that occasion. Judge Lowery judged that, in certain circumstances, or whatever it happens to be. That's what I'm trying to figure out. Let me ask you this, just out of curiosity here. Why has it taken so long for your clients to initiate this action to have this land declared a reservation after so many years and decades and such? What's responsible for the lapse of time before you've done this? Your Honor, in this court's decision in Grand Traverse Band versus the United States Attorney's Office in 2004, it went through the history of how the lower peninsula bands subject to the 1855 Treaty were subjected to an unlawful withdrawal of their federal recognition as Indian tribes. It didn't mean they stopped to be federally recognized, but the United States withdrew its supervisory. It abdicated its responsibilities, and that lasted through most of the 20th century, and the tribes were not re-recognized until 1994. At that point, or shortly thereafter, enacted a constitution and declared their reservation boundaries to be coincident with the reservation boundaries in the 1855 Treaty. The tribe has maintained that that was a reservation. I think just the eventual conflicts with the state and surrounding municipalities caused the tribe to need to file for declaratory and injunctive relief in 2015. One more point I'd like to make, Your Honor, if I could, the notion of establishing an allotment mechanism in a treaty. There's nothing inconsistent about reservation establishment with such a provision, and I'd point Your Honor's attention to Manny Penny's 1854 Treaty with the Omaha, an issue in Nebraska v. Parker, his 1855 Treaty with the Chippewa, an issue in the Supreme Court's Millax case, and the 1854 Treaty of LaPointe, an issue in this court's decision in Naftali. In all three of those cases, the Supreme Court in this court recognized those treaties who have created permanent reservations, and indeed the defendants have held them up as models of permanent reservation status, yet each provided for allotment and each provided for the eventual issuance of patents in fee, yet each was a permanent reservation. Right there in the structure of those treaties, at the onset of reservation creation, they provide for allotment, as did many other Manny Penny treaties. Counselor, I believe you're out of time here and you have some rebuttal time. Thank you very much. We'll hear from your opponents at this point. I guess Mr. Levine is next, aren't you? Yes, Your Honor. I'm simply waiting for the clock. Thank you. Good afternoon, and may it please the Court. Michigan Assistant A.G. Shoshi Levine on behalf of Governor Whitmer. I'll be addressing why the District Court held that the 1855 Treaty temporarily withdrew unsold public lands from sale and was not understood by the Anishinaabe Bands who signed it to create Indian reservations. Mr. Boldry is going to be addressing the Indian Country Test in more depth, and Mr. Garish is going to be addressing the Cross Appeal. Faced with the threat of removal by the federal government, these Bands sought shelter in state citizens, part of a larger strategy that they repeatedly documented in writing. But the tribe now claims that its ancestors abruptly abandoned that shelter in state jurisdiction in 1855 by signing a treaty with the understanding that they would be residents of an Indian country, of an Indian reservation, under federal jurisdiction. The record does not support that implausible theory. The District Court's decision must be affirmed because of the correctly applied Mille Lacs, the controlling Supreme Court precedent on interpreting Indian treaties. The District Court also correctly applied the Indian Country Test articulated in U.S.B. John, and affirmed in Citizen Band, which requires lands to be set aside, set apart for Indian purposes subject to federal superintendence. Further, the District Court engaged in a detailed analysis of the text of the 1855 Treaty and conducted a thorough review of the record. To understand the perspective in 1855. Finally, the District Court properly recognized that the tribe, as the non-movement, had failed to demonstrate the existence of a material fact requiring trial, which is why it granted defense motions for summary judgment. The tribe makes an unconvincing attack against the plain language of the treaty. First, it isolates and places unwarranted emphasis on the phrases, tracked reserve of Tiran, and a forested reservation, claiming that they refer to an Indian reservation. But the word reservation has never been used solely to mean an Indian reservation, equivalent to Indian country under federal law. Let me ask you about the McGirt decision. There was a reference to an act of Congress from 1870-ish, where they used the word reservation, and seemed to deem that to be a term of art. And we have here some, I think, some evidence of treaties from the 1870s using the word reservation. Are you disputing that that would not be a term of art in the 1870s treaties that are evidence in this case? If I understand correctly the passage you're referring to, Your Honor, what they actually cited was more language from the treaty, not just the term Indian reservation. And they did not say it wasn't a term of art in federal law. To the contrary, McGirt actually says that federal law at the time did not give the term reservation the same import that it has today. And so one of the biggest challenges in this case is to understand that the documents we read are written in English, but it's a language that's not spoken in exactly the same way we speak it today. Today, we know what USC 1151 defines what Indian country is. There are other definitions back then. And I would point out that the Hitchcock case on which the tribe relies actually is not articulating the test for Indian country. If you look at the 1834 Trade and Intercourse Act, which is the backdrop of both of the treaties that issue in Hitchcock, it actually has terms that meet all the elements of the test for Indian country. That in the words of USB Pelican, would have segregated Indian lands reserved from accession from the public domain. So what we're seeing in McGirt is a Supreme Court that has looked at the text of the Creek treaties, seen all the hallmark language of creating a reservation in the 1830s, 40s, 50s, 60s, and said, we don't have to go through that three-part analysis because we know it when we see it. And in fact, none of the parties disputed that those treaties had created some form of Indian country. They focused instead on which type of Indian country had been created. They found the faulty premise that the tribe advances here, that there is some different tests for an Indian reservation versus a dependent Indian community. There is only one test. That test was stated in USB John, and it was affirmed in Citizen Band. And that's the test that the tribe invoked in their complaint when they actually cited to 18 U.S.C. 1151. It's my position that the treaty did create some form of Indian country or no form of Indian country. No form of Indian country, your honor. In fact, it temporarily withdrew land for the sole purpose of allowing Indian land selection. And that's the term. The land was set aside for your client is that that was not to be Indian country. In fact, the land was not set aside. That is a different type of term of art. Instead, it was withdrawn from sale. That's a temporary status for the land. And we know it's temporary because the Article I of the treaty specifically identifies a one-year period to create lists, followed by two five-year periods, the first to make land selections and the second to purchase land. And at the end of that time, all the lands that were not selected or purchased remain the property of the United States and were subject to disposition like all other public lands. What about the land, the allotments that went to Indians? I believe there's a provision that says at the end of the 10-year period, the president could actually continue to hold the land in trust if the Indian was not deemed to be simple. Do you recall that provision of the treaty? Yes, I do, Your Honor. What about land? Would that land be considered under the superintendence of the federal government? If it had remained under a certificate with a restriction on alienation, it may have had some federal superintendence. It was never intended to be permanent because even the restricted fee certificates that were issued under the treaty guaranteed what the treaty called ultimate title. And in fact, there's a distinction between the certificates that are issued under this treaty and certificates issued under other treaties like the 1864 Savanaugh Treaty, where the treaty actually created classes of Indians who were either deemed competent or incompetent. Here, I think the issue is ultimately moot because there are no certificates outstanding, there are no lands that continue to remain withdrawn from sale, and there are no more restricted fee lands out there at all. These Indians obtained, after significant hardship, they obtained the patents promised in the treaty, and then the other lands were disposed of. I see that my time has elapsed. I've got one more question. Oh, certainly, Your Honor. What evidence is there as to which, well, I ask your opposing counsel, whether there's evidence of the tribe actually governing the land in the years after the treaty. And I'm asking you, is there any evidence of the state governing the land? For instance, are there criminal prosecutions of anyone by the state in this land immediately after the treaty, tribal prosecutions? Is there anything to indicate which government was controlling the land after the treaty? Yes, Your Honor. Local governments were formed. They imposed taxes on the land. That's part of the sad history of land loss for the tribe's ancestors. You have local officials who are there governing the land, they're writing to the United States on behalf of band members seeking some sort of intercession there. What you have is also a complete absence of federal superintendents. And I don't mean that this is neglect. I mean that in the 1880s, when the United States was compiling tables of Indian reservations in Michigan, and in other states and territories, all of the areas described in Article One are missing. But the reservations described in the 1854 Treaty at Issue in the Naphtali case are there. And the reservation described in the 1864 Saginaw Treaty is there, plus two additional reservations that were effectively trust lands. These lands are not there. You have state jurisdiction. Yes, there are prosecutions. There are also appeals to the state to assist these members of these bands. The state runs schools there. There is no evidence of federal superintendents. And I'd also like to draw a distinction here, Your Honor, between the tribes and their ability to govern their people versus superintendents of the land, because it's the land itself that's critical to this question in this case. If this is an area that's a reservation, you would expect to see treaty language, like the language in the Creek Treaties at Issue in McGirt, where the state's jurisdiction is excluded. There is no language in the 1855 Treaty excluding the state jurisdiction. And where the federal government says, if the state, or in that case also a territory, attempts to intrude on tribal governance, we, the United States, will exercise our military might and remove any intruders and ensure that you continue to exercise jurisdiction. There is no such promise in this treaty. The language here is very different. And I would say, I realize that the idea of allotment is easy to talk about. Those words do not appear in this treaty. This was never an allotment treaty. And Mr. Jim Petroni, and I say this with all due respect, because I do enjoy litigating with him, he has jumped this phase of the litigation. Instead of proving his claim, he wants the court to focus on disestablishment and diminishment cases. But in all of those cases, like in McGirt, there is some agreement that whatever the basis for Indian country, an executive order, a treaty, a statute, Indian country exists. That did not happen here. And because there was no common land holding created in the 1855 treaty, there was nothing to allot. The language of the treaty itself calls these land selections. And that's what they are, not allotments. So you're indicating the treaty itself has to create some common land ownership by the tribe in order to create a reservation? In order for this to be an allotment treaty, first there has to be a reservation. And then, whether it's in the treaty, like the 1854 treaty, or in a subsequent act of Congress, then there has to be the step of taking that common land holding and dividing it up and issuing certificates or patents. Why couldn't the United States in a treaty just jump past that step and go ahead and do the allotments to individual Indians on a reservation? Why do they have to have this first step of a communal land ownership? Well, that's the example that we see in history, that there is a term of art in the law. There is a common land holding that is actually divided up. Could the United States actually go to the separate step of here is an individual, effectively a trust parcel for an individual? Yes, but that would actually have to have evidence of the United States holding the land in trust in some form. That's documented. That's not what happened here. Instead, you have band members who acquired lands before the treaty, and the treaty assures them that those are their lands. Then you have band members who select lands. Those lands are going to be patented in fee, not restricted, but patented in fee within 10 years. Then they're allowed to acquire lands under the treaty. Those lands are never restricted. Those lands acquired in the second five-year period are patented in fee immediately. And then everything else that's remaining is the property of the United States, and the United States has full discretion. Regardless of what an Indian agent may or may not recommend, the United States has full discretion to dispose of those lands like all other public lands, making them subject to entry and purchase under the public land law. That's what this treaty does. There is no point in time where we have this land that is set apart for the exclusive use of the Indians. That's not happening under this treaty because the areas have already been settled, and there is land that is designable by the Indians throughout the period of time that the treaty is in place, and that that land is under federal superintendent. It's certainly not in the design of this treaty, and that's what Congress was reacting to in the 1870s Act. In the 1870s Act, Congress says, what are the deficiencies here? And there were many. The chief deficiency was that Indian agents had failed to issue the to make sure the Interior Department does that. But they do not continue any patents with any restrictions on alienation. That's what's promised in the treaty, and that's what's actually done. We know it's actually done because we have patents in the record in this case, and you can read them. They have no restriction on alienation. So there is sort of a hypothetical question of what might have happened if an Indian agent had reserved the restriction on alienation, recommended to the president. It just never happened. And before it could have happened, Congress carried out the promise of the 1855 treaty by requiring the patents to be issued without a restriction on alienation. So whether you see this as an allotment treaty or not, the key concept of an allotment being a because of the treaty. And that's also what distinguishes this case from the diminishment and disestablishment cases. The treaty is the architect of what happens later. And yes, nobody understood that this would actually put the band members at risk of having their lands taken from them. But it's the treaty that dictates what happens next. And it is the understanding of the bans in 1855 that we have to respect today. It's only through hindsight where we attempt to look back and change the deal so it's a better deal that you would have the tribe advocating for a reservation. There is no part of Indian policy in the 19th century that was favorable to the Indians. And this was a group of people with wise leaders who were powerful in their own communities, who negotiated on behalf of band members to the best of their They wrote to federal and state officials repeatedly outlining their strategy, and they actually executed it. And you see that in the text of the treaty itself. So if you go beyond just the two phrases that the tribe wants to read in isolation, and you look at the history surrounding the treaty, and the understanding of people like Asadan, and Wabaji, and Kenoshans, and Namiwashkete, these are people who asked for And it took time, but they got it. And their bet that this would keep them from being removed from the place they felt connected to at a spiritual level, they had hardship, but they succeeded. They are here today because of the bargain they struck in 1855. And that's something that nobody should want to undo. That's a history of which they can be proud. Counsel, you should wrap up there. We're running over time here. We need to go to Mr. Baltry next. My last point before asking to affirm your honor is simply to point the court to our briefing on the 1994 Reaffirmation Act. That's a statute in which only the tribe's experts spoke to a committee of Congress in which the tribe's lobbyists and other advocates actually did not inform anybody that they would claim an Indian reservation. The tribe's 36th witness, the former tribal chair, actually testified to that, and his deposition testimony is in the record. And the text of the 1994 Reaffirmation Act itself does not say there is a treaty-based reservation. It establishes a federal service area within 70 miles of the boundaries in Article I. A federal service area is not within the definition of Indian country in 18 U.S.C. 1151. And I thank the court for its time, and the governor respectfully asks that the court affirm. Thank you very much. We'll hear from, I believe, Mr. Baldry. Yes, your honor. May it please the court, Lance Baldry on behalf of the Emmett County Lakeshore Association and Protection of Rights Alliance. The legal test for the creation of a reservation articulated by the Supreme Court in 1914 in the Pelican case remains the same. Land validly set apart for the Indians as such under the superintendence of the federal government. Over time, what constitutes Indian country has evolved. Initially, Indian country meant unceded lands over which a tribe retained aboriginal title. From 1802, federal traded intercourse acts heavily regulated such lands by, for example, prohibiting liquor and regulating who could enter. Land reserved from session was thus Indian country and was under federal superintendence. Through judicial interpretations, Indian country came to include reservations created out of ceded land. And in Pelican, the Supreme Court determined that allotments were Indian country. In Sandoval, and as later explained in Venati, dependent Indian communities were found to be Indian country. Those three categories are spelled out in 18 U.S.C. 1151 because they all represent the types of land holdings that satisfy the same three-part test that U.S. v. John did apply to determine if a reservation has been created. Set aside Indian purposes and federal superintendence. The most critical difference between that three-part test and the test suggested by the tribe is the element of federal superintendence. But as then Judge Gorsuch recognized in the Tenth Circuit's hydro resources case, federal superintendence is not inherent in any set aside of land for Indians. As Judge Gorsuch wrote, quote, land simply conveyed to individual Indians or tribes that they are then free to use for non-Indian purposes or sell as they wish does not qualify as Indian country. And that's what I'm talking about. What about the five-year period and possibly even longer for the ones that weren't deemed competent at the end of the 10-year period? There was some superintendence, wouldn't you agree, for the parcels when they were given to the Indians? There is a pause of the ongoing sale of land that had already been occurring in this area for a five-year period simply for the individual Indians to be able to make their selections. But that is not federal superintendence over the entire area of any lasting character. If you look at it as superintendence over each parcel of land, sure, it's not superintendence over the land in total, but over each parcel, why doesn't that satisfy the superintendence requirement for creation of a reservation? Well, even assuming that it did, we'd then be talking about 10 to 15 percent of the area claimed by the tribe because that's all that was actually selected by the Indians at that period. But we don't really do that parcel-by-parcel analysis here. What the tribe is looking at here and arguing is that the entirety of this 260,000 acres that was temporarily withdrawn becomes a reservation. Well, the federal government superintended the non-chosen land for at least the second five-year period when they made it available to any Indians to purchase. Wouldn't that be superintendence for the second five-year period? Indians were the only individuals allowed to make a purchase during that time, but it's really no different than public domain land that others can purchase at different periods of time. It's simply limited to who can purchase it. But it would be after that five-year period that others could purchase? After the five-year period, others could purchase, yes. I guess what I'm having trouble with, I mean, it seems to me there probably was some period of superintendence here, but for various reasons it went away. So when we're talking about superintendence, is it required that superintendents continue on in perpetuity or could a reservation be created initially with superintendents, which then goes away at some point for some reason, but you could still have a reservation? Well, I certainly think Congress would be within its rights to create a temporary reservation, and the federal government would be within its rights to do so. I mean, I'm talking about a permanent reservation that had a temporary superintendence that only went for some period of time, and at some point the federal government decides the reservation doesn't need superintendents anymore. Could you still have a reservation after the superintendents goes away? No, and particularly here where there's no contemplated continuing federal superintendents. I'm not aware of any case in which there's no superintendents continuing whatsoever. Even if you look at the diminishment cases, we first found that a permanent reservation was established in those cases, whereas here that was never the aim of the treaty. The aim of the treaty here was to have land essentially deeded to the individual Indians to be under state jurisdiction, and so you see that evidence of state jurisdiction even in the treaty journal where there's a discussion of the land is going to be subject to taxes. Well, that's not federal taxation because there isn't any at that time. That is state property taxation and taxation by local governments, and then you see that as well even after the creation of the ratification of the treaty where you have some land that is in fact conveyed to be held in trust for a tribal entity in one part of the area, but that land is conveyed to the state, to the governor, not held by the federal government. All right. I know you're out of time, so we will proceed, and Mr. Garish, I believe, you would be next. Thank you, Your Honor. May it please the Court, Jeffrey Garish on behalf of several municipalities that have intervened because they have a very serious interest in this case. Where I'd like to begin is by stressing a point that I think bears emphasis, and that is this. None of the Indians wanted a reservation. They didn't want one. They didn't negotiate one, and they never believed they had one, and that's why I would respectfully submit that Judge Clay did not get straight answers to two questions that were asked. The first was, what part of the treaty creates a reservation? You didn't get a straight answer because no part of the treaty creates a reservation. The operative language in the treaty is the grant of land to each Indian section that gives to each Ottawa and Chippewa Indian selections of land. That's all the treaty did. That's what the tribe understood at the time. If you look at the treaty journal, it's absolutely clear, and I would just cite page 42 of Mr. Giampetroni's brief, cites two statements by two Indians claiming that they wanted reservations, but if you look at those, they're statements of Wabajig and Shawasing. Both of them, if you look at the record, which is page ID 7065 and 7064, they also said they wanted titles the way the white man had. They wanted patents. He cannot find a single statement from any Indian that said they wanted a reservation as opposed to actual title to individual lands for individual Indians. Let me stress here too, there's nothing incompatible. We're not saying that there's an incompatibility between reservations and allotments. I don't disagree with what Ms. Levine said about allotments, but we use allotment in its common ordinary meaning of a land selection. That's how the ICC also used that term, and that's how Judge Maloney also used the term as just another way of saying that what this treaty did was it gave Indians the right to select individual lands for ownership and fee, and that's all this did, and that's all the Indians believed that it did, which brings me to the other question you asked, Judge Clay, to which I don't think you got a straight answer, which is why did it take the tribe so long? Because they never thought this created a reservation. They didn't think so at the time, and they didn't think so a century later in 1950 when they filed their proceedings with the ICC. The purpose of the ICC proceedings were to compensate this tribe for this land that they ceded in 1836, and the ICC focused specifically on whether anything was given back to the tribe in the 1855 treaty that warranted an offset. The ICC analyzed that treaty and determined that it gave the Indian tribes nothing, nothing that warranted an offset of one penny. That's why they didn't get an offset. They prevailed, and that finding bars them from bringing this case for two reasons. Number one, the court issued a ruling and they're barred by res judicata, and number two, they specifically took the position that there was no reservation, at least implicitly, so they can't now say that there was. I see that my time is up. I would love to try to answer any questions the court has, but if not, I will rest. I know the court has heard a lot of arguments. Thank you very much. It's time we'll have a little serious time. Thank you, your honor. First of all, in response to Judge Bush's question, absolutely a reservation does not require communally held property, and the defendants in 200 pages of briefing have never cited a case or a source of law stating to the contrary. That said, this reservation did establish commonly held property when it reserved, when it set aside lands for the bands and thereafter provided for 40-acre lots and 60-acre lots within the tract reserved for in the band, reserved for the band with whom to which he may belong. That's in the text of the treaty. It set aside land specifically for the band, and then it allotted them to the individual Indians. In terms of federal superintendents and federal jurisdiction, your honors, in our briefing, we have set forth documentation that is emphatic that these Indian agents were exercising federal jurisdiction not only over the allotments, but in the open unallotted areas, removing intruders and so forth. To answer Judge Bush's question, yes, you can have a reservation where federal superintendents exist, and then it goes away. As this court held in Grand Traverse Band versus the United States Attorney's Office in 2004, that happened to these Indians in 1872 when the Secretary of Interior illegally withdrew the federal trust relationship, and that was based on what this court called a misreading of the treaty, and it set the bands into a wilderness of lack of federal assistance and superintendents. It's exactly what happened to the Creeks as Justice Gorsuch explained in McGirt. That total abdication of federal supervision and superintendents was not inconsistent with reservation status. In Nebraska v. Parker, the tribe and the federal government were absent from the area for over 100 years. Justice Thomas pointed out that the federal government have treated this land as Nebraska's for over 120 years. And finally, I'd note Ms. Levine's suggestion that the Indians came in there simply to negotiate themselves out of existence is simply not at all a fair assessment of what Indians would have sought to do heading into those negotiations. Final point here, Your Honor, is that what Ms. Levine cited as examples of state jurisdiction are the illegal taxation that took place, what she called the sad history. That took place after Secretary Delano withdrew the tribe's protections and everyone set in and state and local governments. And when Justice Gorsuch looked at the same kind of history in McGirt, he said that is absolutely no way to infer back to the treaty negotiators' intentions based on broken treaty promises and fraud and the like. I think that's it, Your Honor. All right, and you are out of time. Thank you for your arguments. The case is submitted. Thank you. Thank you. Case number 20-5367, Amity Coach v. Thames Healthcare Group, LLC, argument not to exceed 15 minutes per side. Ms. Lewis, you may proceed for the appellant. Thank you. May it please the Court, Counsel, I am Advocate Lewis on behalf of Appellant Amity Coach. We are dealing with claims under the Kentucky Civil Rights Act for disability discrimination and retaliation and claims under the Family Medical Leave Act for interference and retaliation. Both were dismissed on summary judgment and an opinion in which the district court took a lot of the disputed material facts and looked at them with a light most favorable to Thames. And as we go through today, I hope that you will see the reason that this opinion should be reversed so that it can go forward on its merits. For Coach's Kentucky Civil Rights Act disability discrimination claim, she presented sufficient evidence of a disability looking at definitions 2 and 3, that she had a record of disability and that she was regarded as disabled. And a helpful case to guide us with this is MX Group Inc. v. City of Covington of Judge Clay and Senior Judge Butchelder. And that case involved a methadone clinic. So, obviously, the people going to the clinic, even though they had an impairment, they had a history of addiction, they were trying to get better. So, the entire goal was that it would no longer substantially limit major life activity. However, the fact that they were at the clinic in the first place meant that they had a history of that. And also that there's a good chance that the other side regarded them as disabled. And that is similar here because Amity Coach, ideally, when she has the medication that she needs, even though she has documented impairments, she doesn't want them to substantially limit her life activities. And when she unexpectedly lost access to that medication and she had one isolated week in which it did substantially limit her life activities, that is where the trouble started. She does have a record of disability and the record shows that in 2016, no medications were working for her. They were even considering electroshock therapy. And there are also some attendance issues from early in 2016, which is outside of the 12-month flipback period, but still does show that it was substantially impacting her work. What evidence do you have that James knew that her medication was not working for her conditions? Yes, Dr. Bush. Are you referring to 2016 or the week in question? I'm just asking generally what evidence you have. Okay. That James was aware that her medication did not take care of her ADHD. Well, there is a disputed issue of material factors to how much Steffi herself admitted on her deposition that she knew about the ADHD. And Coach's testimony was that both Steffi and McGuire knew. We also have a piece of evidence that she knew about the medication she was taking, that Ms. Coach was taking. In their text messages, yes, Ms. Coach let Ms. Steffi know that she had run out of her medication. Okay. Did they have any knowledge that the medication did not work when she took the medication? Oh, when taking the medication, it did work. The problem was that she no longer had access to it. She was relying on samples. She didn't yet have a prescription. If you have medication that takes care of the condition, medication can take care of the condition. My understanding of disability under the act, which I believe the Kentucky Act uses the pre-2008 definition of disability under the ADA. Yes. I'm sorry. Is that your understanding, the pre-2008 definition under the ADA for disability? Yes. And that specifically impacts the first definition. Okay. I thought under that definition of disability, if there is medication that will take care of your condition, it is not a disability. Well, under NX Group Inc., that wasn't what they worked with, and that was before these 1008 amendments, so they were working with the same standards. NX Group Inc.? Yes. Okay. Counsel, when did the employer become aware that your client claimed to be disabled? Having a condition or missing work from time to time doesn't necessarily put the employer on notice that you claim to be disabled, but when is it your position that either your client provided notice to the employer or the employer became aware that she was disabled or claimed to be? Coach claims that she told Steffi and McGuire beforehand, but it's undisputed that once they received the letter from her medical care provider, Lemon, which was before her termination, they undoubtedly knew at that regard. I'm not quite sure what point in time you're referencing there. As far as a date? Do you have a date or anything? No, Ms. Cooch doesn't have a specific date of when her conversation with Steffi regarding her impairment took place, but we do have the date of the letter, which was written the 17th and turned into things on the 18th, and Ms. Cooch was fired on the 20th. Well, allegedly, the decision was made to terminate your client before the letter was received by at least one day. What difference does that make in your analysis? Well, FAMES has provided three different dates, the 16th, the 17th, and the 20th, and officially, her termination happened the 20th. The wheels started before then, but for most cases that look at the wheels of termination being in process, that's before anything happened that had to do with the incident around the disability. In this case, we were in the midst of the incident that was caused by the disability, and it's a disputed issue of material facts, looking at the facts and the like. It's a coach that Steffi did already know at that point in McGuire, and Steffi admitted herself that she already knew about the ADHD. So that kind of overlaps with how FAMES would have a reason to know of Coach's disability. I think we pretty thoroughly touched on that. Ross versus Campbell is another helpful case there. If we want to go on to pretext, there are basically just a lot of inconsistencies in FAMES reasonings, and when there's competing evidence, the evidence is mixed, then summary judgment is not appropriate. So, for instance, FAMES states that Coach violated its policy, but she did follow a policy to excuse non-chargeable absences and for intermittent FMLA leave, which says that you only have to use the call-in procedures absent unusual circumstances, and Coach had an unusual circumstance. In addition, FAMES had exit interview policy that it refused to do an exit interview with Coach. It tried to keep referencing things that happened outside of the 12-month look-back period. It ignored the fact that she had not done enough to be fired under their progressive discipline policy. There's just several things in the record that shows that it was an insufficient incidence to warrant her termination and to question if the reasons provided did motivate termination. In terms of pretext, do you need to show or is your client required to show that other similarly-situated employees were treated better in relation to their terminations, and if so, is there any evidence in this case that you can point to in that regard? We do not have information on other employees, but the pretext element of showing that a reasonable jury could find that the employer was being dishonest is an acceptable way, combined with the preemptation element, to pass the summary judgment hurdle. I'm not quite sure I understood what you just said there. Could you repeat that, please? Yes. To establish pretext, one needs to show that the employer's provided reasons have no basis in fact, that they did not actually motivate the termination, or that her provided reasons were insufficient to warrant termination. All right. As I understand it, the employer is saying she was fired because of the absenteeism policy, that she had not called the right people before she showed up, or she didn't show up, and this occurred numerous times, and therefore under the policy, that's the reason they fired her. What evidence is there that that's not a legitimate reason for their having fired her? Because they ignored parts of their policy that didn't line up with what they wanted. They had a progressive disciplinary policy, and her absences didn't meet the level of termination. In addition, they were supposed to follow up and ask for additional medical support if they didn't like Lemon's letter. Lemon's letter even specifically said to follow up if they had any additional questions. They were supposed to even pay for another medical opinion if they wanted one. Regarding who she contacted, she was permitted to contact Steffi because she could contact either her supervisor, department head, or the head nurse in charge, and Steffi was both department head and her supervisor. All right, we are very short on time. I will go over to notice on FMLA really quick, and so under Walton, employees don't have to specifically cite the FMLA when they are requesting notice. Shrouder cites a specific circumstance with the example of a voicemail box is full, meaning that that's an excuse for attempting notice and it not happening. That's kind of similar to what happened here with Coach attempting to text and attempting texting, but their reception didn't go through, and attempting to call, but the reception didn't go through, which is a communication problem on the employer's end and is an exception that Shrouder described. Are you saying that your client did not provide notice of her desire to take FMLA leave when she attempted to, and the reason she was not able to do so was because of the way the communication was set up by the employer? Is that the argument here? May I answer your question? I'm out of time. Yeah, you can answer that if you would. Yes, no, she did provide sufficient notice because of the exception. She attempted to provide notice. She sent a text. Her phone records also support that she attempted to call Steffi. The communication issue is an exceptional circumstance, and if you look at TAM's policies, even within their policies, there are exceptions, so that is a disputed issue of material facts, whether she meets all of those exceptions. Anything else on that point? No, your honor. All right, okay. Well, I see you're out of time, and you do have three minutes for rebuttal, but you still have available, so we'll go to Mr. Wright. Thank you, your honors. May it please the court, Joey Wright on behalf of Appalachian TAM's health care group, LLC. My point focuses on numerous factual discrepancies that they have kind of tried to highlight in an attempt to overlook or distract the court from the fact that there are no disputes of material facts, those facts that might affect the outcome of the lawsuit, and here there are no disputes of material fact, and you haven't heard any today. I'll begin with, if we looked at the elements of the claims, I think this will become clear, but I'll begin, my opponent began with the KCRA disability claim, and Judge Bush, you're correct that the disability as defined in KCRA is the pre-ADAA definition, and if medication mitigates or manages the condition that is alleged to be the disability, that is not considered a substantial limit on a major life activity sufficient for a statutory disability under the KCRA. Here, the district court exhaustively reviewed the record and noted that Ms. Coach's medication did manage the condition. You mentioned or asked about whether or not TAM's had any knowledge of the medication not working. TAM's had no knowledge that Ms. Coach was taking medication for major depressive disorder, let alone that the medication wasn't working at the time, and in this argument, Ms. Coach has consistently tried to bring up evidence of her ADHD, and in fact, noting that in 2016, she had a drug test that had Adderall, showed Adderall in her test, but I want to be clear that the ADHD is not relevant to this analysis because it is not what was the disability in this or the alleged disability in this circumstance. Here, as Ms. Coach notes in her brief, many times labeling this a major depressive episode, it is not the ADHD that is alleged to have kept Ms. Coach from notifying TAM's inconsistency with its policies or appearing for work, so I think it's important that the court separate out here two conditions that Ms. Coach may indeed have, but legally speaking and for these claims that we're relevant to what we're talking about today. Ms. Coach focuses on the second prong regarded as or a record of disability under the KCRA. The district court correctly found that she had no disability, and therefore, she couldn't prove that she was regarded as having or had a record of having a statutory disability under the KCRA. That's a correct interpretation of the KCRA. The statute reads that there's a record of such an impairment, and that impairment is referring to subsection 1, which is an impairment that substantially limits a major life activity, and there's no evidence of that in the record. Ms. Coach has not presented personalized evidence of a disability as required by Kentucky law. Hallahan, the Courier-Journal notes, and the same thing with Toyota manufacturing from the Supreme Court, that the determination of whether an employee has a statutory disability under the ADA or under the KCRA is based on personalized evidence of how that condition may affect a major life activity of that individual. Here, Ms. Coach hasn't even pointed to what major life activity this condition affected. She has cited the National Institutes of Health for symptoms of ADHD and major depressive disorder, but there's no evidence in the record that those symptoms are what Ms. Coach deals with, and she has not presented those facts throughout this litigation, despite having an opportunity to do so. So, the KCRA claim, the disability claim, we think, you know, she can't meet the proof of a disability off the bat. As far as pretext, all that's required is that the employer have an honest belief in its decision for terminating her, and Smith v. Chrysler, Ms. Coach says it's just a reasonable basis for the termination, but it's not a reasonable basis as Judge Bushy pointed out or asked about previously. Thames did that. It cited its absentee policies as the basis for the termination, and there's no indication that there was any sort of motivation or otherwise or other facts that would indicate that it was not based on the absentee policies. What about if Ms. Coach and Thames did not follow consistently the policies? Sure. Do you have a response to that? Sure. So, first of all, let me kind of clarify what the policies state or require. The policies require that an employee call in two hours before the beginning of their shift to notify the admin nurse or the department head, the staffing nurse. First of all, Steffi and Nicole Jessie, who is the assistant director of nursing, both testified that they are not responsible or proper contacts for scheduling purposes. There are different hallways in this facility. Each hallway has a unit head, and those nurses are the proper contacts for staffing. And then if an employee does not call within two hours before the shift, that is determined to be a no call, no show, and two of those is automatic termination. The first one is a final warning, and the second one is an automatic termination. Here, what happened was that Ms. Coach simply did not comply with those policies. And there are unusual circumstances that come in when we are talking about intermittent FMLA leave. As Ms. Coach has alleged and argued in her brief before this court, that she was seeking intermittent FMLA leave. The policies clearly state that if an employee is seeking intermittent FMLA leave, they must comply with standard call-in procedures. This court in Sprouter noted that employers can terminate employees when they are seeking FMLA leave for not complying with attendance policy. Here, Ms. Coach simply did not comply because she did not agree with the policies. She knew that she was not supposed to contact Steffi, but she found that, to quote her words, asinine, and so she directly contacted Steffi, who is not the supervisor for this purpose, for staffing or scheduling purposes. And there are no unusual circumstances in the record because of two reasons. One, the cell service issue that we are talking about with Steffi's cell phone problems, that is irrelevant because Ms. Coach should not have been contacting Steffi in the first place. Ms. Steffi testified that the facility has a 24-7 nurse available that you can contact and then the number for the admin nurse or the proper contact to talk about scheduling. It is not as if this was a labyrinth of numbers to pick from or look at. All she had to do was contact the facility and talk to the proper person. And then, on top of that, there are no unusual circumstances because Ms. Coach was physically able to comply with these policies and procedures. As the record shows and the district court pointed out, over the course of this relevant time period, she sent and received over 700 text messages and made nearly a dozen phone calls. The notion that she somehow was unable to do so is just simply not out by the record. And so, we, you know, obtained a search and the district court found that there is a legitimate reason for us to terminate her and it is consistent with the policies as they're outlined. You know, the discrepancies come in when you're looking at other leave that Coach wasn't seeking. Here, it's clear. If you don't call and you don't show up, two of those automatic termination. And if you want intermittent FMLA leave, you've got to comply with those standard calling procedures. And the DON and the ADON are not proper contacts for that. And, you know, that's, we think, fairly straightforward here and not an interference or request for FMLA leave. If I could, too, I'd like to turn to Ms. Coach's request for FMLA leave or alleged request for FMLA leave and Tame's knowledge of any sort of disability or alleged serious health condition. To put it simply, Tame's did not know of Ms. Coach's major depressive disorder at all. The first record of Tame's finding out about it is August 18th when Coach presents a letter in the chair of Ms. Steffi. Before that, there's no record in Coach's file. There's no indication anywhere that Tame's was aware that she had depression of any sort. And, again, I want to emphasize that ADHD is not what we're talking about here. Her depression is the alleged serious health condition in this circumstance. And Tame's just simply did not know about it. And Coach has not developed proof that Tame's did know about it until the letter from Lemon that was given to them on August 18th. And then the interference claim, the district court correctly reviewed that FMLA interference claim and held that Ms. Coach did not provide the facility with proper notice because on August 16th she texted Steffi. There's some dispute on whether Steffi received that text, but even if the court, we assume that Steffi received it, it's not sufficient notice for FMLA leave. It simply says that I'm on a medication and it hit me hard. I can't get that medication. It hit me hard on Sunday, which was three days prior to her sending that text message. It doesn't tell anything about what condition she's suffering. It doesn't say anything about when she's coming back. It doesn't say anything about whether she's able to do anything. It doesn't even request leave of any sort. And so the district court, again, found that even if the court looked at it and said she did receive that text message, again, putting all inferences in favor of the plaintiff by assuming that she received that text message, notice was still insufficient and her FMLA claim fails. And so her FMLA claims fail because there's no notice. She didn't comply with policies. She hasn't provided medical proof of an incapacity. And the employer, Thames, did not have knowledge before making the decision to terminate her on August 16th. So there's no retaliation. The serious health condition of the FMLA to be the equivalent of the disability definition under the other act, or is it something different? I'm trying to figure out what is the serious health condition under the FMLA? Sure. I think you did not have a serious health condition. We are, Your Honor, we are contending that she did not prove incapacity, a period of incapacity for three consecutive days, which is required under FMLA as part of the serious health condition. Various subsections as statutory claims go, but as part of her serious health condition, she alleges that she was receiving continuous treatment. In order to prove continuous treatment, she must show a period of incapacity, which means inability to attend school, work, do daily, regular daily activities as part of that claim. So now to your question, they are very similar. The disability determination under the KCRA requires proof that she was experiencing substantial limitations on a major life activity. A major life activity is any sort of daily activity. It can be working, sleeping, reading, those things, which overlaps very closely with the regular daily activity that incapacity requires under the FMLA. So we would argue, yes, Judge Bush, that there's lack of proof because there's no personalized proof that she was experiencing it, incapacity or a disability in the record, other than her saying she was experiencing it. Is it not enough that you're just receiving treatment from a healthcare provider to have a serious health condition? So I want to sort of, with a fine point here, say serious health condition, yes, and there's case law that, and I think Ms. Coach has cited that there's case law that says a major depressive disorder is a serious health condition. Our point is that under, and I can pull the actual statutory site, but under the FMLA regulations and statutes, she must, in order to prove continuous treatment for the time that she missed work, she must show a period of incapacity for three consecutive days. That's the part that we are arguing she has not shown, is the period of incapacity, which exists separately, but underneath a serious health condition. All right, Counselor, you've been out of time for a while, so thank you for your argument, and we will take rebuttal at this point. Thank you. Regarding the policy and whether it was or was not followed, the Unemployment Commission found that Ms. Coach did not violate any policies. They said that she violated the no-call, no-show, and the Unemployment Commission did not agree with that. The way the no-call, no-show policy is worded is it is grouped with foreseeable absences, but there's a completely different section about absences that don't count against you. So if an employee is sick, if they bring in a doctor's note on their return date, then that's a non-chargeable absence and can't be held against them. And it says in that section that if you end up with too many non-chargeable absences, you should probably sit down and talk to your supervisor about what's best. That can't coexist with the no-call, no-show policy. Coach needed to bring in a doctor's note, and she did that. And regarding whether Steffi or Justie have an opinion about whether they are the appropriate person to call, they are listed as people she can call and that they are her supervisor and the head of the department. And for the intermittent policy that Mr. Wright cited, there is a qualifier of absent unusual circumstances in there. As far as showing personalized evidence of major depressive disorder with Ms. Coach, she ended up and testified that she was mentally incapacitated, that she couldn't function, and that she didn't feel safe to work with patients, which is a huge deal and definitely shows that it was having a substantial impact on her work. Jumping over to FMLA leaves, incapacity can also be shown through having a chronic condition, such as depression, which Hansen versus Sen-Kantari, as the Seventh Circuit talks about. And in that situation, technically you don't even need a doctor's note. So Coach actually went above and beyond in bringing in a doctor's note for the purpose of showing that she had a period of episodic incapacity for her chronic condition of depression. Do you agree that ADHD is not an issue in this case? I agree that it is not what spiked her major depressive episode. So we should be only focusing on her depression as the underlying alleged disability or medical condition. I do think it's a little more complicated than that since Lemon was medicating her for both conditions, and both conditions were mentioned in the medical letter. And nurse practitioner Lemon is the only person with medical knowledge that has participated in this case so far, and we can't substitute our lay knowledge for medical knowledge. They had an opportunity to get their own medical person to look at the situation, and they chose not to. And I believe that's Swanson that talks about not being able to substitute lay opinions for medical opinions. Thank you. All right. Thank you for your argument, and the case is submitted. Once the attorneys are exited, you may call the next case. Counsel, you may disconnect. Thank you. Please grab counsel for the third case. Okay. It looks like we have all of counsel ready. I will go ahead and call the next case. All right. Case number 20-5393, Carolyn Tipton versus Commissioner of Social Security. Argument not to exceed 15 minutes per side. Mr. Jones, you may proceed for the appellant. Thank you. May it please the court. Daniel Jones on behalf of the plaintiff's appellant, Carolyn A. Tipton. This is an appeal of an agency decision from the Social Security Administration denying Ms. Tipton disability benefits. In this case, Ms. Tipton suffers from a combination of physical impairments, primarily rheumatological, including fibromyalgia and connective tissue disease, as well as arthritic conditions. These have been followed primarily by her treating board certified rheumatologist, Dr. Brackett, as well as by a group of pain management medical providers. Plaintiff's argument in this case centers on whether the administrative law judge properly determined Ms. Tipton's residual functional capacity, or RFC, which is basically the Social Security Administration's way of saying what can Ms. Tipton do in an eight-hour workday on a consistent basis, five days a week or 40 hours a week. Ms. Tipton has raised two arguments regarding this issue, one having to do with the opinions from the treating doctor and one having to do with her testimony. Before I get to that, I just want to briefly talk about the standard of review here, because there's no dispute that this court is reviewing the agency decision for whether it's supported by substantial evidence or not. But I also want to point out that the other issue is whether there's also reversals required when there's an error of law. And that's where most of the issues arise in this case. So this court has actually held that in the Rogers case that when there's an error of law, that itself denotes a lack of substantial evidence. And I think that the Rogers case is a good place to start here, because the facts there are remarkably similar to those in Ms. Tipton's case. Both this case and in Rogers, the claimant suffered from fibromyalgia as well as another rheumatological disorder. In both cases, there was a treating rheumatologist who provided support for the claimant's disability. And in both cases, the opinions from the rheumatologist were rejected based on opinions from a non-examining doctor. And in both cases, the ALJ placed undue weight on the claimant's activities of daily living to find that the claimant's not disabled. And if anything, I think that the facts in this case are even more compelling than those in the Rogers case, because in that case, the ALJ relied on a number of non-examining doctors, including one who was a specialist and who actually testified at the claimant's hearing. Whereas in this case, the ALJ did not rely on the non-examining doctors. In fact, in a lot of ways, disagreed with those opinions, because they reviewed such a limited portion of the record. And to the extent that the ALJ did rely on them, those opinions were based on a significantly undeveloped medical record. So turning specifically to what the ALJ found in this case, what she did was she said she was giving partial weight to the treating rheumatologist, Dr. Brackett. She said she agreed with Dr. Brackett's opinions on how much Ms. Tipton could lift and carry, but then rejected all of the other limitations described by the treating rheumatologist. In particular, how long Ms. Tipton can sit, stand, and walk, which are honestly critical. But also how often Ms. Tipton would require breaks from work during the day and how often she would miss work on a regular basis. The ALJ articulated two reasons for discounting those disabling limitations from Dr. Brackett. So the first finding made by the ALJ was that Dr. Brackett's disabling limitations are unsupported by, quote, grossly normal neurologic markers and unremarkable mental status examinations. Now, while that is true, scientists admit it's not relevant to the opinions from Dr. Brackett. Ms. Tipton hasn't been treated for any neurological conditions or conditions. Her impairments are rheumatological in nature in terms of the fibromyalgia and the connective tissue disease. Secondarily, she's also had a number of musculoskeletal impairments. So what I think that gets at is that the ALJ here was improperly substituting her lay opinion of what findings are relevant to the opinions from Dr. Brackett when there is no contradictory medical opinions on those issues that consider this same evidence. But to get to the point, Dr. Brackett specifically stated that his opinions were based on a number of abnormalities, including blood testing consistent with rheumatological and immunological conditions, including positive ANA tests, positive rheumatoid factor, elevated sedimentation rates, and also clinical abnormalities on examination, which included pain, inflammation, limited motion in multiple joints, reduced grip strength, tenderness, swelling, joint deformities, and trigger points consistent with those that are normally associated with fibromyalgia and are the main finding for diagnosing such conditions. As we noted in our brief, these findings are wholly consistent with both Dr. Brackett's treatment records, but also those from the pain management, who also noted similar findings and even points more severe findings, including deconditioning to the point where she was having atrophy in her muscles. The second reason that the ALJ discounted the opinions from Dr. Brackett had to do with activities. Now, this court has repeatedly held— Tess, let me ask you this. The records seem to say that the ALJ only gave partial weight to the treating physician opinion because of contrary evidence in the record that pretty well demonstrated that she could do some form of work and that her residual functional capacity would permit her to do that. Do you have an opinion as to whether the ALJ was correct in that assessment? If not, if you do, what would that be? Sure. In this case, we basically have an opinion from the treating specialist, and then the only other contrary opinion is the opinion from the non-examining state agency doctors. The ALJ ultimately concludes that Ms. Tipton can perform sedentary work, but it's point of position that the ALJ hasn't cited to any specific evidence that outlines that specific residual functional capacity. Sedentary work would mean that she'd be sitting six hours a day and standing walking the remaining two hours without having any unreasonable breaks or absences from work. Again, this is on a regular and sustained basis. The ALJ in this case discounted both the opinions from the treating doctor and the opinions from the non-examining doctors on those limitations to the extent that they addressed them. In that case, we're left with only the clinical and objective findings here. Now, this court has repeatedly found that the ALJ can't interpret those medical findings into a particular residual functional capacity. Now, there are decisions from the court that have felt that an ALJ can certainly make common-sense judgments about a residual functional capacity based on a reading of the record when there's no evidence to the contrary. The defendant does cite some cases that have held that the ALJ is free to determine an RFC without a specific medical opinion, but those cases are vastly different from this one where the plaintiff has put forth significant evidence from a treating specialist specifically delineating those limitations. There's no case that's held that ALJ can interpret the evidence contrary to the opinions from a treating specialist on that regard. I think that even in the normal case that this court has held that the opinions from non-examining doctors are generally entitled to less weight than treating specialists, but particularly under the facts of this case, it's significant when the treating doctor, the specialist, has cited evidence supporting his opinions. Those findings are consistent with the treatment records both from him and from other sources. The ALJ conceded that the non-examining doctors didn't have a good understanding of residual functional capacity to the extent that she found that actually MSTFDN would have greater limitations, but then did not explain what evidence in the record supports those greater limitations. In addition, the non-examining doctors, as we pointed out, reviewed only a couple months of records here when we're dealing with a period of a few years. In addition to that, neither of the non-examining doctors are relevant specialists in the area of medicine. I just also note quickly to finish my thought that the evidence, as we noted in our reply brief, shows that MSTFDN did significantly have exacerbations frequently in her conditions after the non-examining doctors reviewed it. That evidence was only considered by the treating specialist, not by any other physician. Unless there's any questions, I will defer to the rest of my time. All right. We'll hear from Ms. Ziegler. May it please the court. Anne Ziegler on behalf of the Social Security Administration. Mr. Jones, her plaintiff, frames this case as showing error of law, but really he's not argued any error of law. He's only argued that substantial evidence doesn't support the decision when actually in this case it does. That is the standard of review that we need to keep in mind in this case. Substantial evidence supports the ALJ's decision. It's not whether there's enough evidence to support plaintiff's position because in this case there could be. The question is whether there's substantial evidence, whether the ALJ discussed the evidence supporting his decision and whether a reasonable fact finder, whether a reasonable mind could find that enough supports that conclusion. In this case, it does. How would you distinguish Rogers from this case? Rogers, your honor, honestly, I am not familiar with the facts of Rogers. I don't remember seeing that in the brief, but if I did, I must have missed it. I'm not sure what the facts of that case were. I believe that's the case you cited as establishing the error of law. Oh, yes, your honor. Well, that is true that the court does look at both things, whether substantial evidence supports the decision or whether there is an error of law. I'm saying that counsel hasn't established an error of law. He hasn't argued that there's been an error of law. By the ALJ discounting a treating physician's opinion is not an error of law. It is not an error of law to evaluate the opinion, evidence, the record as a whole and establish an RFC. And doing so, finding an RFC for sedentary work in this case is not an error of law. With respect to Dr. Brackett's treating physician opinion, it is noteworthy that the ALJ didn't discount it completely. And the ALJ did give it partial weight in assessing RFC. And the ALJ articulated sufficient reasons for discounting the opinion for not giving a controlling weight. And that is really the standard that's required. If the ALJ is not going to give a treating physician controlling weight, they have to give good reasons. And the medical evidence in the record didn't support the limitations. Now, counsel argues that the ALJ is reweighing, substituting her own opinion. But that's not really what happened in this case. The ALJ didn't look at the, didn't interpret medical evidence as counsel suggests. The ALJ wasn't looking at lab reports and saying, well, this lab report doesn't show rheumatoid arthritis. That's not what the ALJ did here. The ALJ looked at that evidence and said, yes, it does. Dr. Brackett assessed, diagnosed rheumatoid arthritis and fibromyalgia, I believe, as many of the impairments. And the ALJ found that those were severe impairments. But the ALJ looked at the opinion of functional limitations and found that the objective evidence didn't support the limitations, not that it didn't support the doctor's diagnosis. And that's where the difference, I think, here between what counsel is arguing is that the ALJ didn't look at evidence like an MRI scan and interpret it differently than the doctor did. That's not what happened. Rather, the ALJ looked at the record as a whole, including other opinions, including the state agency opinion and plaintiff's own statement. It's significant to note that plaintiff herself testified that she spent most of her time sitting, that she could lift up to 10 pounds. Both of those are consistent with sedentary work. And the ALJ noted that in the decision, considered her statements, and found that that is consistent with sedentary work. Considered her own statements and considering the opinion evidence, Dr. Brackett's opinion that she could lift 5 to 10 pounds, the state agency opinion that found that she could do light work, when the ALJ, after considering all the evidence, even all that evidence that came in after the state agencies did their review, found that overall the evidence supported limitations not as severe as Dr. Brackett's, but more severe than the state agency. So the ALJ found a middle ground there in between the opinions, considering her own testimony and other evidence, like her activities of daily living.